The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw an eye and give their attention to the court is now sitting. God save the United States and this Honorable Court.  Allegis v. Jordan, Mr. Couture, I would be pleased to hear from you. My name is Michael Couture, and with my co-counsel Don Schroeder and Jillian Collins, we represent the appellants in this action, Justin Jordan, Daniel Curran, Michael Nicholas, and Christopher Hadley. The decision below should be reversed for at least three reasons. First, the restrictive covenants in the Allegis IIP are overbroad and punitive and are coupled with a forfeiture provision that cannot pass muster under Maryland law and this court's decision in Deutsche Post. Second, the remedy that the court chose, a clawback of every penny received, is unsupported by consideration and is again at odds with Maryland law. And third, there were factual disputes that the lower court resolved by making inferences adverse to the non-moving party, the defendants in this case. And for any one of these reasons, and certainly for all of those reasons, the lower court's summary judgment decisions should be reversed. Let me briefly address some salient facts. The plaintiff, Allegis Group, is the largest staffing company in the world with revenues believed to be in excess of $12 billion. Based on its website today, Allegis today has at least 10 subsidiaries, including not only Aerotech and TechSystems, the ones that you read about in the brief, but also the legal recruiter, Major Lindsay in Africa, and Aston Carter, a staffing company for the accounting, finance, and professional sector. Taken together, Allegis and its subsidiaries, which are defined in the IIP as the companies, broadly cover nearly the entire staffing and recruiting industry throughout the United States. The defendants here were all former employees of only one subsidiary, AeroTech, which focuses on staffing engineers in the aerospace, engineering, and high-tech space. The defendants worked hard and very well for Aerotech. The district court do with the alleged overbrought of the prohibitions that you're talking about, didn't it strike those? It struck in a strange way, Your Honor. They struck overbroad restrictive covenants in the employment agreement because those restrictions extended beyond Allegis to the companies. In that case, they had a strange ... Allegis has an appeal there. That's correct. Strangely, what's happened is that in the IIP, which has even broader restrictive covenants, the court simply moved on to the IIP without any kind of analysis and allowed them to go through. It seems to me what you call restrictive covenants almost begs one of the important questions in this case. There was an employment restrictions and the court struck those down as too broad. Consequently, the employees could work in the 250-mile area immediately. The incentive agreement seemed to be a little different. It seemed to be an arrangement by which Allegis, the whole group of companies, alleged that as an incentive to grow the companies, participate in the growth, be recognized in the participation of the growth, and to protect that growth for 30 months after they leave, you can receive a bonus. But you don't have to receive the bonus. You don't have to take it. But if you elect to do that, and so what you call covenants are really conditions for the incentive, as I would just read it straight on. Now, if you want to try to fit it in the covenants, that's your best argument, I think. You try to make it an employment agreement, but they have an employment agreement, and that was ruled on favorably to your clients. What the court did on the incentive agreement was to say that these employees did not honor the undertakings to get that money, and as a consequence, they're not entitled to it. I think that's where we stand on it. So I think for my own purposes, it would be better just to instead of give them categories that make you win automatically, just address the contractual language of this incentive agreement. Well, I think, Your Honor, first of all, there is law to the effect that where one has a satellite agreement that is related to one's employment, that it should be treated under Maryland law as an employment agreement, and one looks at the IIP and the term employee appears something like 50 times. I would Stock incentive programs, they're all agreements connected with your employment, but the public policy that restricts employment agreements is based on the notion that it prohibits you from working and earning a living in the area in which you are skilled and where you do live. And so those have to be construed narrowly in furtherance of that public policy. But here, these employees could work and could take a job. They just couldn't get the incentive, if they could get the incentive, if they agreed to the restrictions, which were restrictions promoting the allegious group, the whole group of companies, and grow their business and participate. Let me raise two issues with that, and then I want to talk about the remedy, because... Mr. Jordan, who's the major amount of the money here, he signed that IIP back in 1999, and the point of it was to incentivize him to work. He worked hard as a result. It's really deferred compensation more than anything else. The fact that it... It was not. It said it earned no value. It was a conditional bonus, and when he left, it looks like he had the intent to form his own business, and he knew the business well. He was a big hitter, and he need not have taken that bonus. He knew that if he formed his own business in competition, he wasn't entitled to it, and... So let me address, I think, another error then of the court, which is the remedy, because although, with respect, I think, as we set out in our... With respect to the remedy, I mean, I think I'm following a little bit on Judge Niemeyer's question, but wasn't everything along the line in this arrangement voluntary? Voluntary contracting? I'm not sure I see the element of duress that would add to the strength of your case. For example, there was no... Sometimes we see in these agreements, if you're going to work here, you've got to agree to these restrictions if you leave, and we don't have that here. They weren't saying you've got to sign this in order to work at Allegis, and this incentive agreement where you got the bonus if you went the two and a half years, you didn't have to sign that, and you could, as I understand it, you could withdraw from it at any point in time, and further, just in support of the voluntary nature of this, along the lines of, as I understand it, your clients were represented by counsel before signing the agreement and the acknowledgement letter and the rest. So the general point I'm making, and I'd like to hear your response to it, is that it seems that every juncture, there's a voluntariness involved that differentiates, that may differentiate what happened here with the kind of anti-competitive aspect that we have found suspicious in other arrangements. I think there's a few points that I'd make, Your Honor. First of all, there are other non-compete cases, including the Holloway case from the Supreme Court of Appeals in Maryland, where money is the issue. It's not necessarily just a simple question of an injunction that you can't work. Restrictive covenants have been found where there is a money component, a damages component, if you go off and compete or solicit. So the fact that it's money versus an order whether you can or cannot work is not, I would say, dispositive. You could compete in this sense. Isn't it important here that this is a non-solicitation agreement rather than... I don't actually think that's true, Your Honor. I'm sorry. You're perfectly able to work for a competitor with a legis as long as you didn't solicit their customers or their employees. I thought it did not prohibit you from taking future employment with a company that might have been competitive in some sense with a legis. Well, actually, I think if one looks at 9-3 and 9-5, it's far more than a non-solicitation agreement because the language of those clauses say that if you do anything to divert business away from an allegiance company, and I mean any allegiance company. I don't just mean the Aerotech company. It could be Major Lindsay in Africa. If you divert business under Section 9-5, a friend comes to say, I want to leave Major Lindsay in Africa. I want to go work for another legal recruiter. And you say, you know, I think that's a good idea. That's a violation of 9-5 and you would thereby... They seem to hone in on soliciting or contacting employees and attempting to influence customers or personnel of allegiance. Those, that seems to be the heart of 9-3 and... Well, while it may be the heart, I think Deutsche Post teaches that we don't look just at the heart of such covenants. We look at what they mean across the board and what effect they may have on the employee. And when add to that, this remarkable provision in Section 9 that says, if a person like Mr. Jordan even dares challenge 9-3 or 9-5, then if he wins, he has to give back all the money. I mean, there... These are not covenants that are breached. He didn't have an obligation to do that. He voluntarily assumed that. And these were conditions for his getting the bonus. And the bonus was healthy. And the bonus didn't just affect his employment. It affected the growth of the aegis group. Well, you know, Your Honor, on that point, I think we don't know whether... There's no facts to establish whether, for example... It's right in the face of... No, no, I understand that, Your Honor. But we don't know whether the aegis group, the other 9 or 10 subsidiaries actually pulled down the value of the aegis stock. We don't know whether his work for Aerotech was enhanced by them being part of the whole or was, in fact, detracted as part of the whole. It was that any employee for the group who advances the group's business and agrees to protect the group's business for 30 months after he leaves can get a bonus. And the idea is if all the employees are pulling for the group, that'll help grow the business. But these are not things that are breached. These are conditions that must be satisfied. And there's a lot of difference on them because, as Judge Wilkinson pointed out, it's a voluntary program. So he can engage in it as long as he satisfies the conditions, he gets paid. Well, again, the condition... He gets paid along the way. So these are not really conditions perceived. He gets paid as he did. Well, he gets paid after he leaves, right? He gets paid after he leaves. Well, that's... And so there's installment payments and there's a tail, 50%. There's a tail. And the question then, and I think that the remedy issue is a key one, which is that equity abhors a forfeiture. And what has happened... The contract says he doesn't earn it until he satisfies the conditions. And so he has these advances paid to him. He enjoys that. But he understands if he doesn't satisfy the conditions, he's not entitled to them. Well, but I think, again, the question of how much damage has been done here... Damage? Well, he has gotten paid. It's a bonus. It's a return of a bonus that he didn't earn. Well, so first of all, the other point, I think, is that the facts as found by the judge don't support that, in fact, he breached the 30 months. The judge finds... That was summary judgment. It was summary judgment. Looking at the contract, the face of the contract, right? Right, but we have to draw... We have to know what he did. And the... The record shows what he did. I mean, there's numerous things he did. He clearly called on customers. He expensed those customers to his new business. And he spoke to the former employees about the business. I think, Your Honor, that's not... Those inferences were found by the court and... These are emails. Well, but in fact, Your Honor, the only email that is referred to by the judge, the fact of preparing to compete is not a violation of the IIP. He called on the former customers to try to sell his business, and they were customers of Aegis and of the Aegis Group. But not of Aerotech, Your Honor. He... Well, the incentives are Aegis Group, a group of companies. And with all respect, Your Honor, that attempts to extend the... The incentive. It's not any covenant. It's an incentive. If you protect this business group, you get an incentive. And he violated this business group, and he did it knowingly. Well, but Your Honor, this work was done by Mr. Jordan. The company promises him these payments. Presumably, he gets a lower salary as a result of these incentives. Where do you get that? Well, I mean, the company doesn't freely give money away. So... It's a bonus? Well, but as... They didn't lower his salary. Where in the record does it show they lowered his salary? We don't know, Your Honor. Again, these are factual issues. We really don't know. The judge decided on... Well, there are any number of factual issues. For example, the fact that the other two gentlemen, actually, the three gentlemen, informed Allegis, said, we're leaving to join Mr. Jordan's company. We're not going to compete with Aerotech. We're only going to compete in another area. They did that expressly. That's in the record. And Allegis didn't complain. They said, the employees said, we're moving our families 250 miles so that we can be outside the geographic limitation. Listen, they were all sensitive. Mr. Jordan testified to the fact, as a matter of fact, he said, I formed these businesses and talked to these people, and we stayed out of the 250 zone, which was basically a confession. He was violating the condition of the incentive agreement. He wasn't... He was accommodating the non-competition clause, which the district court held illegal. But he also accommodated by not actually doing any work, actually having any business done until after his 30 months were done. He called on other people, and that's in the record. He called on other people at those customers that were not the Aerotech people that he had called on. Mr. Tutar, can I ask you a question about a case that apparently did not get a lot of attention in the district court and seems to address at least partially the issue in this case? Instinctively, I would agree with my colleagues that this agreement doesn't quite quack like a duck in the sense of a traditional non-compete, and I think the majority of jurisdictions have held as much. But it seems to me that the food fare case that was not discussed much below, at least in Maryland, seems to suggest that whether or not you style this as a non-compete or the devolution or elimination of a bonus, it still is a restraint in trade, at least as the Maryland courts have interpreted it, and this seems to me very similar to the facts of that case. So I'd like you to talk about that case if you would. May I, Procedure Honor? I know that the light is red. Oh, please answer the question. Yes, I think food fare is kind of the foundational case for Maryland law in which it basically says we are opposed to those contractual provisions that will indeed be restraints on trade. In fact, it says we recognize that the plan, that was a pension plan, it's a little bit different, it says we recognize that the plan as a contract does not restrain Greeley's rights to future employment in the sense that it does not present the classic situation, and then it goes on, but it says that doesn't matter. That's right. It quacks like a duck, and it looks like a duck, and it's a duck, and we have to treat it in the same way as we would treat a classic non-compete, subject to the restrictions that are typical of non-competes. And I think that, Your Honors, you're dead on, and I think one has to think of these as restraints on trade because Mr. Jordan is, in fact, with a strong monetary incentive being told you can't work, you can't do, and Maryland law has... Don't you think that a pension plan might be considered compensation for your employment? Well, in fact, I think a pension plan is, if I may, less of the reasons in favor of the food fare case are actually... I'm asking you a question. Is a pension plan compensation for your employment? It's promised in exchange for your work. That's true, Your Honor, but that pension plan is just simply for being at the company. Here, there's an incentive to work harder... Let's stick with the question. Question is, you're saying a pension plan is just being at the company? Don't you have to work? Yes, of course, Your Honor. I'm sorry. I didn't mean it that way. You do have to work, but the performance of your work, how hard you work, that extra oomph, which is what the incentive plan does here, Mr. Jordan was earning larger amounts of units because he was doing a great job. I mean, the board came in and said, Mr. Jordan, because of the quality of your work, we're going to give you 20,000 units rather than 10,000 units rather than 5,000. That's not the case with a pension plan. And so looking at the food fair as an example, here is they're dangling this over Mr. Jordan's head during his employment, saying, work harder, stay later, do what needs to be done, unlike the pension plan, where if you work, you work for 40 hours, you get the pension plan. So this is hung out over Mr. Jordan's head. And at the end, they say, you can't work. You cannot provide useful activity to the people in Maryland, which is what this is all about. Restraining trade, restraining Mr. Jordan and these other people from providing the highest quality work in the fields that they know best. That's why it's a restraint on trade, just like in food fair. So it's not just an incentive plan, Your Honor. I think it's styled in this way, but again, it's styled in a way with this particularly pernicious clause as well that says, don't you dare come into court and challenge this because we're going to take it all away from you. That can't be appropriate. Under food fair, under Deutsche Post. Suggesting that the bonus resulted in a lower salary, that's always the case with any person, a salesman who is on commission, or any number of folks who work in the world of finance, any number of folks who work on a bonus or commission basis, depending on the business they bring in or the profits they achieve or whatever, and those bonuses are always incentives to work harder, but that fact alone doesn't render them unlawful or impermissible. Certainly not, Your Honor, but I think an agreement that said, you're going to work on commission, and we're not going to pay you the commissions until after you leave, and then if you compete while you're leaving, you don't get those commissions. I don't think that that would be consistent with food fair or Deutsche Post as simply an incentive plan. That would be, you're working hard now, we're going to dangle it over your head for two years, you can't work for that except to get that commission, and if you stay out of our lane, we'll give you a commission. The fact is that the record reflects that Allegis and its subsidiaries cover something like 99% or 98% of the Fortune 500. They have people involved in all of these companies. If you look at, again, you can take judicial notice of their website, they have completely covered the staffing field. If this agreement had been limited to the three principal companies at issue in this case, would we have a different result? You mean Aerotech, TechSystems, and Allegis? If it were limited to Aerotech, it would be. Not TechSystems. TechSystems is a different vertical. I thought there was evidence in the record that these individuals had some connection or at least client contact with TechSystems. The court below, despite finding against the defendants in this case, found clearly that there was no goodwill earned by these people in the area of TechSystems, the thing that TechSystems did. And Zachary Piper was created to go after a very particular group of staffing, that is high security clearance, DOD, sensitive compartmented information, a particular area that was not in the Aerotech space. They very deliberately stayed away from it. Now the fact that they go to Lockheed or they go to Boeing, that's because Allegis covers all of those companies. So if you say go out and work and do something else, Mr. Jordan would really have to change what it is that he knows how to do. He wouldn't. This is the whole point of the initial questions was his employment agreement would have prohibited that, but his employment agreement was invalid and he could work. He could work 100 percent in competition. He could call on those companies. What he couldn't do is earn a bonus that was conditioned on his not calling on those people. And again, that was the nature of it was a separate incentive agreement. And it was not just Aerotech. It was to promote the group, the Aegis group. And they were basically, they probably have it with employees across the group saying if you promote the group while you're here and for 30 months afterwards, we'll give you an incentive. And he elected voluntarily to participate. And again, you're right. I think if one looks at the Holloway case, leading case in Maryland and the food fare case, which proceeds and is followed by Holloway, the fact that there is some after requiring money, but which has a condition on it that you cannot work or you cannot do certain things. You can't compete in a certain way. Those should be reviewed as restrictive covenants under Maryland law. And when you do and you look at the breadth of 9-3-1 between an employment contract where you're paid for your work, including pension benefits and an incentive agreement which you can voluntarily enter into as an additional bonus. With all respect, your honor, when you have the kind of money that's being dangled here for these employees who worked for. The production was just too heavy. Well, they worked for 10 years, your honor, knowing that in each case. Well, Mr. Dutar, I guess it's not really whether or not you see a difference. It's the question of whether or not the Maryland courts have seen the difference. I don't think they have. There's nothing else, your honor. Thank you. Chaplain Johnson for Allegious Group. So we've spent a lot of time already this morning talking about the IEP. And I think it's important to understand specifically how it differs from an employment agreement. The IEP is an incentive investment plan. It is offered by Allegious Group. I don't know that I'm all that interested in that. I think I'm more interested in finding out how it differs from the incentive agreement that was that was defined as a non-compete in the food fare case. Why don't you get to that? Okay. So if you look at the IEP, the language of the IEP says that the establishment of the accounts, which is what happens when they tell a new participant that they've been awarded participation in the plan, you get an account. Right. And during the course of your employment, you are potentially awarded units. Based on performance. But under the contractual language of the IEP and as noted by the appellants in their brief, you can't read contracts. You have to read the terms of the contracts to assume that nothing is surplusage. In other words, you have to read a contract to give every provision meaning. The IEP explicitly states the establishment of an account does not create any and in any participant rights in or entitlement to payments. Right. That just because you get an account while you're employed does not mean you have an entitlement to one cent after you leave under the IEP. Okay. So there's the IEP, which is the plan. There is award letters that are given during employment or award agreements that are given during employment, say units. This is like this is kind of a bucket of potentiality. Right. This is a unit that you may get to cash in on after you leave if you comply with Section 9 of the. All that suggests to me is that this is a more carefully crafted agreement than you might have found in food fare. But the point is that there is no just as in this case, there was no restraint on trade on the employee in food fare. He or she was free to compete. But if he or she decided to compete, she would not be entitled. He or she would not be entitled to the pension benefits in that case. And I don't see how that is any different than what this agreement says here. If you even if you want to construe. This is not me. The Maryland courts have construed it that way. And I'm asking you, how do you distinguish that case other than the fact that perhaps there was a vested interest early on? Maybe that's enough of a distinction. I'm not so sure, because the only thing that has happened here is that there is no vesting until after the employee leaves. The point remains the same. That employee is free to compete or not. But if they do, they forfeit whatever benefits, call them units, pension benefits, deferred compensation. It doesn't matter. Maryland courts appear to be in the minority in construing these agreements differently than the majority of courts. I don't know that I necessarily agree with that reasoning, but that seems to be the law in Maryland. Your Honor, but the question doesn't end there. Even if you even if the Maryland law were to construe the IAP Section 9 provisions as restraints on trade. And they do outline parameters on what should or should not happen as far as post employment activity by participants if they want to get the money. It is. There are restrictions. Section 9.3 and Section 9.5 that are at issue before us today have restrictions in them. To the extent that there are restrictions, there are restraints on trade. We're not. If you fail to comply with the conditions of 9.3 and 9.5 with respect to customers and pension units earned or whatever that was accumulated before the point of separation. Hang on. Was there a forfeiture of any benefit or monetary benefit of any nature whatsoever that was accumulated before the point? Is this is this an agreement that is focused solely on the post termination period or does it link back in some way to things that were accumulated prior to the point of separation? The only monies that were subject to repayment under the IAP were the IIP payments, which were not. I'm not talking just about repayment. I'm talking about forfeiture of units or forfeiture of whatever. That's different from repayment of the particular monies that were earned and repayment of the particular monies that were received during the 30 month period. But I'm talking about a different thing. I'm not talking about repayments or whatever that were in place before they left the company. Your Honor, there is no there is the whole rubric of the IAP does not seek to claw back salary or bonuses or anything of the nature, which is my understanding. That's something that's connected with pension eventually. Pension rights, the pension rights do best sometimes after 10 years and then you can un-best them if you engage in certain behaviors. There's no pension issue, Your Honor. There's no pension units or pension rights being affected by that. Representing to me that there was no diminution of any kind with respect to particularly pension eligibility or benefits. Yes, Your Honor. This all has to do with strictly the four squares, the IAP, nothing outside of it. As far as it's all post term. Yes, Your Honor. And, you know, if you look at the result and going back to is there a Maryland case that makes that distinction, do you think? I don't think that there's authority that I can point to that would go to the distinction that you're looking for, Your Honor, as far as that I that I would go back to the point that even if you look at them as restraints of trade, which is what Your Honor is suggesting Maryland law would do is saying that these are restraints of trade. They're not they're not conditions prerequisite. Even if you look at that, it doesn't end the inquiry because all then they would just need to be reasonable under the facts of the case. Right. Under Maryland law. And here you've got a plan that's premised completely on high level executives. These are not low level salespeople. These are high level individuals within the AeroTec organization who under the IAP had the ability to get payments based on the value of allegiance common stock, the parent common stock, which, of course, would take into consideration the performance of tech systems and AeroTec and other subsidiaries, some of which were mentioned by that now exists. We're not at play back at the time. Right. So it the whole plan says we'll pay you after you leave if you don't compete with the organization with limits. And those limits are set forth in section nine, and it does not say you can't go compete at all. There is a geographically based non-compete provision. There is a employee non-solicit provision. There is a section 595 that is don't divert, solicit or take away our customers' employees. The agreement had been for, let's say, five years instead of two and a half and had been over a larger geographic area than was present here. Would that have made a difference? I mean, how far can you extend this principle? What what the law requires is that the restrictions be reasonable under the facts of the case. Right. So under the hypothetical that you've given, if this is a much longer restriction or geographically more broad restriction, then it would be a question about whether or not the facts of issue in a particular case warranted having restrictions that broad. And in this case, so the results that appellants would have under under your view of the clause here, these individual employees would be barred from soliciting clients, prospective clients of the companies, not existing clients of the companies. Is that what about that? The restriction issue that we've got, Your Honor, is Section 95 about soliciting business from the companies, influencing companies, customers or personnel not to do business with the companies. It's talking about the customers of the companies. And there is no dispute that the Lockheed Martins and Northrop Grumman's of the world that our issue here are our customers of the companies. So going back to what's reasonable under these facts, you know, these are high level executives did not kind of work in silos where they didn't know what or anything were going on at tech systems with respect to IT staffing. The record establishes that they they were privy to and received reports about the activities of tech systems that they intended, attended national meetings with tech systems executives, and that there was information share and cross selling amongst the organizations. There's been no evidence of refuting that. So it's not that these individuals were kind of in some sort of blind, you know, silo where they didn't know about tech systems while they're employed. And that's one of the reasons having restrictions that go to the allegious organization as opposed to just errata is reasonable. Mr. Court in this case found the employment agreements, which were similar, I guess, in trade. So why is the language of this any different? Because if you're going back to the purpose, the intent and the facts surrounding the IP, as opposed to the employment context restriction, it's not the language, it's just a broader purpose. It isn't it is, in fact, the the language and the purpose, which is part of the overall facts of the case to look at the language, the language of the non-compete. And what I'm asking you is how is the language of this not this post employment agreement, different from the language of the non-compete that the district court found to be unenforced? Well, one, it's a voluntary participation to it is relative to receiving payments that are based on the value of allegious common stock as a whole, not error tech allegiance. So if you take it to where appellants would have you go, that if these are overly broad because it extends to other allegiance subsidiaries and therefore should only be limited to competing with respect to error tech, their employer, then it would be OK for them to keep almost one point five million dollars in incentive payments while that were based that money, that dollar amount was based on the value of the common stock of allegiance as whole, while they're simultaneously destroying some of the value of allegiance by competing with one of its big subsidiaries. So, you know, if you look at the circumstances of the IEP, the purpose and the reason for it as a voluntary plan, these individuals were not forced to sign up on these. This was a voluntary plan that paid lucrative benefits to already very well paid individuals for complying with Section 9. They could have, you know, if Justin Jordan had when he left and had the intentions of straight on competing, soliciting tech system customers, he could have just said, no, I don't want the money. In practical terms, what are the parties disputing here? Is it basically whether the company has or doesn't have the right to have its grants or its monies returned? Is that what's practically at stake here? The question of whether the company has a right to repayment of those monies that it is spending over the past 25 months or whatever. There are, I think, three primary issues before the court, Your Honor. One is that did Allegis Group in fashioning this voluntary program as and this is, you know, no good deed goes unpunished. Right. They they come up with an idea to have an incentive plan that very handsomely rewards high level executives. And they structure it in a way. My question, I am asking you whether as a practical matter, we are talking about Allegis' right to have repaid the money that it has given the three, Jordan, Hadley and Curran, the monies that it has given them thus far in the course of this plan winding out. I think it's it's that, Your Honor, but it's that plus more. It's fundamentally does Allegis have the right when fashioning a program like this, which is a voluntary program both for the participation and as an employer to decide to offer as a company. I understand that that's your argument and I'm not asking you to give it up. I'm simply asking you that if you do not win, if this is supposing arguendo, I'm not speaking for myself or any other member of the panel, but let's just suppose arguendo, that you don't win on the question of the enforceability of 9-3 and 9-5, maybe because of the food fare case or maybe whatever. Does that, if what's at issue here is your right to repayment, the fact that they are found, if arguendo, you may win on that, but if arguendo, they're found unenforceable as restraints of trade, does that necessarily do your right to repayment? Well, Your Honor, the IEP specifically provides for repayment if the restrictions are found to be unenforceable and then also with respect to, you know, rescission and restitution and trying to put Allegis back in the place it would have been had it not handed out one and a half million dollars to these individuals or the contract. What you're saying is that Section 9 of the plan says if a court finds any portions of the plan unenforceable, that they would return the payments? Yes, Your Honor. Okay. So you're saying you have a right to the payments nonetheless, but the question I have is, is that in itself a restraint of trade, that repayment provision? It was completely voluntary. To the extent that none of this was forced upon the individuals, Your Honor, there has been no restraint of trade that, you know, that, you know, they've talked about these pernicious and draconian restrictions. These are all voluntary. They could have just said, I'm leaving. It's been nice. I'm going to go do my own thing. And they could, and Mr. Jordan and his colleagues could have started Zachary Piper and everything else. Is the right to repayment sufficiently severable from the underlying provisions that each of them are to be decided on their own, on their own merits or their own basis? I don't think you even need the contractual provision to award repayment to allegiance because if there's going to be an, the whole deal would have to be legally unmade and allegiance restored to its previous. You're arguing you have a right to repayment on the basis of rescission. In addition to the contractual language, Your Honor. Is the contractual language argument with respect to repayment a stronger argument than the rescission argument? Because the difficulty that I would have with the rescission argument is rescission seems to put people back at the starting block. And I'm just not sure if this person is, an individual has performed 25 months of a 30 percent repayment, but you would have gotten the benefit of your bargain to some extent. Not completely, because you structured the agreement that there's a 50 percent repayment at the end, but you would have gotten the benefit of your bargain to a significant extent and rescission can't sort of undo that. Now the question of the contractual right to repayment is a different matter or maybe a different matter because it was signed voluntarily knowing that this would be challenged in court and the folks that signed it, signed it with the assistance of counsel. So it doesn't, it wasn't a coerced situation. And so I'm wondering if that provides just possibly a narrower ground to respect the food fare decision and to give you the benefit of the contractual arrangement and accord some weight on the scale to the voluntary nature of the whole transaction. Your Honor, with respect to, you know, your initial question about which one. Not necessarily a hostile question, I'm just asking you for assistance with it. Yes, Your Honor. And so with respect to the IEP and the fact that it does have a repayment provision that is specifically tied to a finding, if the restrictions are unenforceable, I think if you were to ask me which one I think is the stronger, I think it's the stronger. I think that the whole. I think this was not a condition of employment and the fact that it was, you know, the enforceability of it is a close question. And the fact that you were represented by counsel, not you, but your opponents were represented by counsel when they signed all this. Is that way on the scale? Well, the fact that they were sophisticated business people that have counsel certainly weighed in favor of giving the meaning to every provision in the agreement. And the finding that there was no coercion and it was voluntary. And the appellants would essentially pick and choose the provisions of this IEP that they would want to have remain in place. The IEP is what gave them any entitlement to the payments to begin with. So to have a result which would allow them to say, oh, but the restrictions are unenforceable, but I keep the money, is not, is just picking and choosing which parts of the restrictions that they would like to have enforced. As I understand it, there remains in this case a claim for unjust enrichment, which would, I would think, provide a remedy outside of the contract that would allow the district court to fashion something perhaps along the line that Judge Wilkinson was talking about, some remedy short of, you know, full contractual execution. Have you all thought about that? Your Honor, with respect to the appeal here today, that's not an issue before the court. I also believe I'm out of time. I just want to make sure I have leave to continue. Go ahead, read it aloud. And answer Judge Diaz's point. As I stand here today, that has not been considered by the parties, Your Honor, because of the ruling on the summary judgment finding liability and finding it having a judgment in this case that we simply want to have affirmed and be able to repay and have the money repaid. Well, there's some appeal to that approach, and maybe it is fully supplanted by the contractual provision, but it seems to me if payments are understood to be made in exchange for this post-separation loyalty for 30 months, if the person doesn't engage in the post-separation loyalty because he thinks it's illegal, then he would be unjustly enriched because that's clearly what the payment was for. And if he didn't engage in that, but I suppose the contractual language is pretty clear, too. It says that if any portion of Section 9 is declared to be unenforceable, then in the same sense, the participants return the money. The money is in exchange for this loyalty, for this protection of the company for 30 months after separance. And if they don't engage in those conditions or don't participate in that, for one reason or the other, either they chose not to or it's held invalid, then the incentive was paid for unjustly. I think that's Judge Diaz's question, but your argument is that it wasn't raised. It may or may not have been raised. The theory of recovery in this case was restitution or rescission, wasn't it? Restitution, rescission, and then, in addition, enforcement of contractual. I just wonder whether, again, it would be possible to assume arguendo the provisions were unenforceable and then go to the contractual language, which would still give you a right to repayment. Do you see what I'm saying? Yes, Your Honor. I think that the contract. It should be. That's an acceptable reading, Your Honor. That's an acceptable reading, Your Honor. I think I shall adopt it. Are there any further questions? Thank you very much. I'm sure you think that's not acceptable. I don't, Your Honor. I don't. Can I just touch on a couple of points? Thank you, Judge Diaz. I went back and looked more closely at food fare, and the similarities are really quite clear. This was also from the profits of the whole food fare group, and it was called an incentive bonus and retirement plan. So there was this incentive plan that says that after you're done, you will get a pension plan that is paid for out of the profits of the group as a whole. So work really hard, and at the end. But after you leave, if you act in any way inimical to the good of the company, including So food fare is then followed in Holloway, which is in 1990, and I don't think there's any change in the law from the Supreme Court, the Court of Appeals of Maryland after Holloway following food fare. There's no question that that case remains good law, and I would contend, along with the suggestions or the questions that you've been asking, Judge Diaz, that it governs here whether people like it differently or not. That's the law from the highest court in Maryland. Second, I do want to make it clear. I don't think there's anything in the record that the defendants here had counsel at the time that they signed the plan or when they got the award letter. They didn't have counsel until finally when the acknowledgment letter is signed, 10 years after Mr. Jordan first signed the IIP. I don't believe there's anything in the record that he had counsel when he signed that clause or had that provision which says don't think about challenging this, because otherwise we're going to take your money away. I mean, I think what concerns me is this doesn't seem to me, I mean, this seems to be on enforceability a fairly close question, and as all of these things that depend and bottom out on the facts of reasonableness can sometimes be in all these non-compete arrangements, bottom out on reasonableness. But it doesn't seem to me that this is a contract that was somehow negotiated by the company in bad faith or that there was an inequality of bargaining power or an element of duress or coercion. And one could actually look at this as a rather than an example of nefarious corporate behavior, it could be looked upon as a win-win opportunity, both for Allegis and for the employee as well. I mean, would we be better off if these contracts were ruled null and void by the courts? Would we be looking at things five years, would lawyers in the corporate boardroom say, oh, no, you can't give the employees this break even if they want it, even if they might want to sign it and earn some money afterwards? I mean, this may seem to redound to the employees positively in your case, but in the long run of cases, it could hurt employees very badly by removing options from the table that somebody who's not going into competing, but somebody who just feels like I've worked long enough, I'm 62, I'm 65, I'd like to leave and I have no idea of competing and I'd like to collect this. And if we remove this option, we're going to hit people near retirement age and deprive them of a chance to earn some money if they want to go into a second career. And that's one of the problems that I've had. May I respond quickly with just two very quick responses? First, in answer to your question, the IIP has provisions in it that work exactly the way that you suggested, Judge Wilkinson. 9-1, 9-2, and 9-4 are all reasonably constrained within the food fare constraints. It's narrowly tailored to the work that you had done before. It's narrowly tailored to a time period. So Allegis could have just stuck with 9-1, 9-2, and 9-4. I guess the second answer I would say, Your Honor, while I'm sympathetic to this notion about the employee, what Maryland has said through its highest court is that for society as a whole, restraints on trade are bad things as a general matter. It's true. Maybe an employee might or might not, but as a general matter, restraints on trade cause the economy to do more poorly. That's a decision that they've made. If we did an antitrust analysis on this, I don't think Maryland seems to suggest that's what we should be doing on this. You have enormous problems about what is the market, what's relevant, what's reasonable, what type of restraints. It seems to me this, unlike the food fare case, is a discreet plan that seeks to pay an employee for building the company and loyalty to the company for 30 months. The employee says, I'll take it. I'll agree to those terms. If it turns out that those terms are unenforceable, the agreement says, everybody goes back to zero. You give me back the money, because the employee voluntarily took the money for that particular benefit, and now the employee didn't provide the benefit. The real question is, why isn't it fair, if it's unenforceable, as you argue, that everybody give back the money, because that's the only reason they got the money, is Section 9. Section 9.1, 9.2, and 9.4 are enforceable. They're enforceable, and the gentlemen who are the defendants here did, in fact, comply with 9.1, 9.2, and 9.4. There's no argument here that they didn't. I'm sorry, Your Honor. My question is, there are benefits to the employee and to the company. That is, if you promote the company, we'll give you X dollars. You promote the company, we'll give you X dollars. And promoting the company means A, B, C, D, and E. Now, the employee says, great, I love it. He takes the money, and then he violates, doesn't comply with A, B, C, D, and E. Should he keep the money? Well, he only maybe doesn't comply with A, but putting that aside. But food fare is exactly the same. I'm asking you a question under the contract. I'm not asking about food fare. I'm asking you, let's say it's unenforceable. Yes. It seems to me this is more discrete arrangement than a food fare, which deals with the pension plan that you earned. There's nothing earned here. This is a benefit that's discrete, and it basically serves one purpose. Promote the company, increase the company, and then don't destroy it for 30 months. Now, we'll give you big bucks for that. But the employee says, I'll take it. Now, he gets that, and he walks out the door and destroys the company. Shouldn't he give that money back? No, this is my hypothetical. OK. Shouldn't he give that money back if it's found unenforceable? He should only give back so much money as the company has actually been damaged. And in this case, you can't. In this case here, the terms and conditions set forth in this section 9 are material and essential terms of any award of units. In the event that any provision of this section 9 of the plan is held to have found invalid or unenforceable for any reason whatsoever by a court of competence and jurisdiction, I assume we're a court of competence and jurisdiction, maybe not competent. And then the action between the participant and such participant shall return to the companies any and all amounts. But your honor, what that seems to me, that's just a notion of fairness. You've gotten a benefit under this contract, a big one, and if those benefits are improperly earned, you return the money. But the clause was improperly included. By your hypothesis, a court of competence and jurisdiction has found that this employee was working under the burden of unenforceable contract that said, you may not. You are restrained from doing certain things. That was an illegal provision. But he said we should voluntarily agree to do that. Well, but we can't voluntarily agree to things that are, I mean, things that are illegal, things that restrain trade. And I don't mean it in the antitrust sense. I mean, in the restrictive covenant sense, he's being told you can't do these things. And a court subsequently says that company should never have said that in the first place. It's not his employment. It's not it's not his compensation for his work. He gets no value for it while he's working. There's no value on the books. It can't be transferred. He has to carry out the conditions and then he gets a bonus. If that is illegal, he has to return the bonus. Now, let me ask you, is that an improper clause? If it's declared illegal, he has to return it? Yes, Your Honor, because a restrictive covenant, which are viewed with skepticism by the Maryland Court of Appeals and need to be reasonably tailored, if that clause was illegal ab initio, because that's what a court of competent jurisdiction has said, you can't do this. Then the fact that he has accepted money on the basis of a condition that should not have ever been in that agreement, because it was illegal, that he then needs to give the money back? I don't think that's appropriate, Your Honor. So what's it mean when a man sits there and signs a contract, he sits at the table with you, and the two of you agree to a provision and say, I'm going to give you $1,000 if you're willing to not compete with me for a year. And the guy says, deal. Here's the $1,000. And it turns out that's illegal. Shouldn't you give the $1,000 back if they have an agreement that if this is illegal, I'll give it back to you? The man who signed this said, I promise to give it back to you if this is unenforceable. Isn't that what he signed? With all respect, Your Honor, I think that contracts that include illegal provisions that prohibit something that you're not that you're not. I'm sorry, Your Honor. Didn't the person who signed this agree to give the money back? With all respect, Your Honor, I think he signed a document not with counsel. He did not have counsel. There's no record here. That's the clear language. If he was a college student, he'd understand it. Well, except, Your Honor, I think we can think of many examples where, for example, there's an overbroad clause in a lease. Why are you resisting the fact that he signed this and agreed to return it? I'm not resisting, Your Honor. You're saying his agreement to return the money is unenforceable. That's what you're saying. But he did agree to return the money. He did agree to that. And then, if it is the case that, in some way, one needs to look at the benefit of the bargain. So what did the company get other than what they weren't entitled to, which was the illegal contract? Then you would, in fact, have this remand to the district court. What did he give to the company? How many months did he not compete? How much did the company get? That isn't what he promised. I understand, but they promised something that wasn't. Why don't we start with contracts to enforce them the way they're written? Then, if there's an overriding policy that says that's illegal, that's another thing. But when two people sit in the room and read it and sign it and say, good deal for both of us, and then he refuses to give the money back, now you have to have a pretty good theory as to why he gets off the hook. Because that's what he's getting off the hook. I don't think he gets off the hook, Your Honor. But the idea that I can make a deal with you, which is against public policy. It's a violation of the problem that I, again, the difficulty that I have is you're trying to push us into a broad position, which is to rule the whole concept of voluntary post-employment agreements on lawful restraints of trade. That's where you're going. I hope that's not the court's. It is where you're going. Because I can tell you that a lot of corporate counsel, by their very nature, are going to be risk averse. And what they do, they'll look at an opinion like this, like what you want, and they say, no, we can't give the, we can't protect ourselves against any future court ruling, and we can't give an employee any post-employment option that might be in that employee's best interest. The courts have taken this whole concept and said that it's impermissible. And that, in the long run, is going to harm many, many people who want to have some sort of retirement where they earn funds by not competing. But, Your Honor, the provisions in the, we are not seeking to strike down the entire IIP. The Section 9-1, which is a non-competition agreement that has reasonable terms and is not applicable to the Major Lindsay in Africa and a whole bunch of other subsidiaries that Allegis has that had nothing to do with Mr. Jordan, that's OK. 9-2, which is a non-solicitation of customers, the customers that you were dealing with, the people you were dealing with directly, that's OK. The not OK is the provision of this kind of monetary benefit. But it is. One can do this so long as you don't try to go beyond the law of food fare, this court's Deutsche Post, Holloway, and try to get more than the law entitles you to. You're not. You're going to strike down the whole concept of the thing. We do not, Your Honor. We are asking only that those restraints on trade be reasonable and consistent with Maryland laws. One note that's going to be reasonable, particularly the whole idea of a contract is to protect against future risk. That's what contracts exist for. And the future risk is at its height when you have a doctrine that turns upon reasonableness, which could go this way or that way or this way or that way. So you say, no, a company can't protect itself against this. Then do you undermine the whole nature of contract, which is to protect against future risk? Did food fare do that, Your Honor, with all respect? Did it do that back in 1972? Did Holloway do that back in 1990? Did this court in 2004 with Deutsche Post? Each of those struck down as unreasonable, restrictive covenants that went beyond what Maryland law believes is appropriate. So as you mentioned, it was compensation for work done. It was an incentive program, Your Honor. And it's like wages for work done. You don't give those back as a matter of public policy. This was a discrete agreement apart from an employment agreement that was sought from executives for good pay. And the executives knew what they were doing. So what you're basically saying that the executives see these dollars, and they'll sign anything, even though it will be in the interest of the company. And when they're being offered, they want to stay with the company. They want to continue to work. If they're willing to agree to take the benefit, they have also agreed to return the benefit if it's illegal. Again, Your Honor, with all respect, I think exactly the same could be said in Deutsche Post or Food Fair or Holloway, especially Food Fair. In Food Fair, there was no express provision that allowed for restitution. But that's implicit in every contract, it seems to me. But there is a difference here. And I think you kind of circled around it. And in the traditional non-compete, if the agreement is found to be unenforceable, the parties are sent back to the status quo, essentially. The employee is free to compete. The employer doesn't get the benefit of an overly restrictive, overly expansive contract provision. But here, I guess the problem is the employer has doled out a substantial amount of money on the assumption that this agreement is going to be enforced. And then the employer is left without a remedy. And you're suggesting that that's perhaps the result of Maryland law. But what about the equitable remedy of unjust enrichment? Have you thought about that? Well, so first of all, let me make one point on this. Allegis actually paid Curran and Nicholas despite having been told expressly that they were going to compete in a certain way and paid them. And they knew that they were going to work with Jordan. So they made those IIP payments with the full knowledge that these two gentlemen were going to go work with Jordan. And they're going to work competitive to tech systems. When Hadley, the third person, decides to leave, then they say, OK, enough's enough. That's too many people. We're not going to do it anymore. So if there are material breaches, and the one I looked into was Jordan. And he seemed to be aggressively soliciting the employees to join up with him on a competitive arrangement with Allegis. He had to know that he was working within or soliciting within that 30-month period. And if he's doing that, and he's committing a material breach of the contract, why then isn't that unjust enrichment to allow him to breach the agreement and to recover all the funds? Well, the why all the funds question, I think that's where I would disagree with you. First of all, the record is not clear. It's a summary judgment record. There has been no trial testimony. But we don't know. It's a remand to determine whether the district or determine whether there was a material breach. Well, even if there's a material breach, your honor, material breach means that you don't have to perform anymore. It doesn't mean that you automatically get all of the money back. Material breach means you stop performing, and then you determine how much damage there really was. That's really, if this court is going to. This agreement doesn't be treated as damage because it was never earned. Well, except that's. What it says is if this is unenforceable, return the monies. And your honor, what I'm trying to answer to is that if one gets out of the contractual provision and into an equitable situation, then the equities would be, I would submit, how much damage, we can't go back to the status quo yet. We just can't because Mr. Jordan did not compete. You can say that he competed aggressively at some point. We don't really know from the trial record when did that begin and whether it was a violation. I'm not sure you appealed that. I think you went after this as a matter of law. The district court found that there was a material breach, and I'm not sure you appealed that. We did, your honor. We argued that there was not sufficient factual foundation, even as to the question of whether the breach occurred two days before the end of the restrictive covenants. He wants to remand on the question of the material breach. And I would say damages because if you're going to be equitable about it, then what should happen is, to the extent that Mr. Jordan did not compete for a period of time, then... All right, let's not go over this long enough. I'm sorry, your honor. It's not your fault at all, it's ours. Thank you very much, your honors. Thank you both. We'll come down and greet counsel and move into our next case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Albert Diaz